# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**BRENTLY DORSEY,**

      **Plaintiff,**

      **v.**

**TOPEKA, KANSAS, CITY OF, et al.,**

      **Defendants.**

**Case No. 2:23-cv-02422-HLT**

## MEMORANDUM AND ORDER

Plaintiff Brently Dorsey sues his former employer[1] for race discrimination, disability discrimination, constructive discharge, and failure to accommodate. Dorsey was not promoted to Division Chief in 2022 and contends the decision not to promote him was discrimination based on race and disability. The City contends it did not promote Dorsey because he received the lowest scores. The City notes that Dorsey and six others interviewed for four open positions. Dorsey scored the lowest; the top four scorers were promoted into the four open positions. The City moves for summary judgment on all claims. Doc. 97.

The Court grants the motion and enters judgment in favor of the City. Dorsey's claim for race discrimination fails because he has not come forward with evidence of pretext. Dorsey's claim for disability discrimination fails because he can't show discrimination or pretext. Dorsey's claim for constructive discharge fails because he voluntarily retired. And Dorsey's failure-to-accommodate claim fails because a promotion is not a reasonable accommodation and because he was otherwise accommodated until he voluntarily retired.

---

[1] Both the City of Topeka and the Topeka Fire Department ("TFD") are named as parties, but the City suggests the TFD is not an entity capable of being sued. The Court refers to Defendants as "the City" throughout.

## I.    BACKGROUND[2]

### A.    TFD Structure and Hiring Procedures

The TFD typically employs 244 uniformed positions. DSOF 25. Firefighters are automatically promoted at the end of the first three years after passing a test. DSOF 16. After the third year, a firefighter must pass a test to be promoted to Apparatus Operator, Lieutenant, and Captain. DSOF 17. Those promotions are guaranteed but the timing is dependent on seniority and test scores. *Id.* There are also specialty positions within the TFD. DSOF 19. A firefighter wishing to transfer to the specialty side must go through an interview process. *Id.* After a probationary year, there are two opportunities for automatic promotion on the specialty side. *Id.*

The command positions in the TFD require application and an interview and are not covered by the union contract. DSOF 21. Selection is based on merit. DSOF 23. These include nine Battalion Chief positions, three Shift Commander positions, and four Division Chief positions. DSOF 22. The Fire Chief makes the ultimate decision on filling these positions. DSOF 24.

The Fire Chief is the highest-ranking position in the TFD and has final authority subject to civil-service rules and the union contract. DSOF 13. The Fire Chief reports to the City Manager, who reports to the Topeka City Council. *Id.* Other than entry-level firefighters and the Fire Chief,

---

[2]    The Court relies on the following facts that are undisputed for purposes of summary judgment and construed in Dorsey's favor. "DSOF" refers to the numbered facts in the City's brief, Doc. 97, and "PSOF" refers to the additional numbered facts in Dorsey's brief, Doc. 107. Resolving this motion and determining these facts was greatly complicated by the parties. Together, the parties offered roughly 300 facts. Many of the facts were repetitive or focused on extraneous detail or minutia not material to resolution of the motion. The parties also intertwined arguments with the facts or offered a heavy-handed gloss in presenting information. The Court ultimately had to review the cited exhibits for essentially every fact to determine what was properly supported and not genuinely disputed. A more judicious approach would have saved everyone time and money. *See Coolidge v. Consol. City of Indianapolis*, 2006 WL 1072995, at *1 (S.D. Ind. 2006) ("Effective lawyering includes identifying those facts that are truly material to one's case and resisting the temptation to throw everything at the court to see what sticks. . . . [N]either does the court have the time or resources to weed through protracted statements of facts in search of those 'needles in the haystack' that are actually relevant to the issues at hand.").

all vacancies within the TFD must be filled from within. DSOF 14. In February 2022, Randy Phillips (White male) was promoted to Fire Chief. DSOF 55; PSOF 2. He named Antony Standifer (Hispanic male) as Deputy Chief. DSOF 55; PSOF 2.

Historically, the practice was for HR to review hiring decisions before final selection. DSOF 24 (including response and reply). From 2008 through 2023, the Director of Human Resources was Jacque Russell (African American female). DSOF 26. Russell testified that "back in the day" the fire department was a "pretty closed environment" that was hard for females and minorities to advance in. DSOF 148. But Russell said that was "a past history," and it hadn't been a persistent complaint during her tenure (from 2008 through 2023). *Id.* (including response and reply). Russell testified she did not believe there was a pervasive problem of racism or sexism throughout the TFD. DSOF 149.[3]

### B.    Dorsey

Dorsey began working as a firefighter in 1994. DSOF 27. Dorsey became a Captain in 2015. DSOF 31. Dorsey testified that he applied at some point in the early 2000s for an inspector position on the specialty side, but a woman was hired for the position. DSOF 28. In 2014, Dorsey applied to be the Fire Marshal, but he was not selected. DSOF 29-30. In 2018, Dorsey applied to two vacant Fire Inspector positions but was not hired. DSOF 36. Phillips and Standifer were not involved in any of the hiring decisions involving Dorsey prior to 2022. DSOF 38.

The City of Topeka personnel manual allows for light duty assignments on a temporary basis, meaning less than a year. DSOF 8. Under the union contract for most TFD employees, light duty assignments may last 18 months and may be extended by HR and the Fire Chief if needed

---

[3]    Russell brought her own claim of discrimination against the City, but her suit was directed at city officials and did not relate to the TFD. *See* DSOF 140; DSOF 148 (including response and reply); *see also* Doc. 97-27 at 14-15.

and if there is an anticipated time to return to a regular position. DSOF 9-10. Sick leave and FMLA leave are also available. DSOF 11. HR does not share with an employee's supervisor the reason for the employee's FMLA leave. DSOF 45.

Dorsey was on FMLA leave from February 2018 through April 2018, when he returned to work on light duty. DSOF 46. Dorsey was diagnosed with leukemia in August 2018 and was on FMLA leave until September 2018, when he returned to full duty. DSOF 47. He has suffered extreme fatigue, chest pain, shortness of breath, anxiety, and trouble sleeping since his diagnosis. PSOF 139. Beginning September 25, 2018, Dorsey was on intermittent FMLA leave until his retirement. DSOF 47. HR did not share the reason for Dorsey's FMLA leave with anyone at the TFD. DSOF 48. Dorsey was treated with oral chemotherapy until late 2022 or early 2023, when his leukemia went into remission. DSOF 49.

Dorsey again went on light duty in October 2021. DSOF 51. His light duty was extended on December 20, 2021, and March 10, 2022. DSOF 52. When the light duty was extended on March 10, 2022, the message anticipated the next follow-up would be on June 4, 2022. DSOF 53. Dorsey assumed his light duty would expire on June 4, 2022, but no one at the TFD or the City of Topeka told him that. DSOF 54. Dorsey testified that he said in his interview for Division Chief that he wanted the position because of his disability, as it was less physically demanding than a typical firefighting position. PSOF 143, 147.

Dorsey never talked to anyone in HR or filed a complaint regarding differential treatment or race discrimination. DSOF 157. Dorsey was permitted to apply for every position he wanted to apply for. *Id.* Dorsey was not subjected to different work requirements because of his disability. *Id.* Dorsey never complained to HR that he was treated differently because of his disability. *Id.*

C.    **2022 Division Chief Openings**

1.    **Job Posting, Qualifications, and Procedures**

In 2022, when Phillips became Fire Chief, nine of the sixteen management-level positions were vacant, including all four Division Chief positions. DSOF 57. These four positions were Division Chief of Operations, Division Chief of EMS and Training, Division Chief of Administration, and Fire Marshal, all of which paid the same salary. DSOF 63. This was unprecedented in TFD history, and filling the positions was a priority. DSOF 58-59. It was the first time Phillips and Standifer conducted a promotion process. DSOF 59. The interim City Manager approved a process to address the unique situation, including conducting a unified interview process for each level of job openings. DSOF 60. This meant there would be one interview process for all Division Chief positions. *Id.*

The rank qualification for Division Chief was also lowered to Captain. DSOF 61. Applicants were required to have held the minimum rank of Captain for two years and have twenty years of firefighting experience. DSOF 64-65. The Captain requirement was a requirement set by Phillips, PSOF 18, though it was approved by the interim City Manager, DSOF 60-61. The Captain requirement was to demonstrate that the applicant had an ability to move through the ranks. PSOF 21. It is also important for Division Chief candidates to have supervisory experience. PSOF 22. Standifer testified the Captain requirement was important to ensure a candidate has had time on the job and knows from experience how the TFD works. PSOF 23. Neither the unified interview process or the rank requirement violated City of Topeka or TFD policy. DSOF 62.

The Division Chief job posting also sought applicants who "have an equivalent combination of education, training and/or experience" to perform the essential job duties. DSOF 64. Previous Division Chief job postings stated that a combination of training, experience, and

education could be considered in lieu of rank, but the 2022 Division Chief posting did not include this language. PSOF 19-20.[4]

Standifer and Phillips drafted and reviewed the job posting and it was approved by HR. DSOF 66. All four Division Chief positions required the same equivalent combination of education, training, and experience. *Id.* If an applicant was permitted to interview, the applicant was deemed qualified, and every applicant deemed qualified was offered an interview. DSOF 67.[5]

Applicants were told to specify which position they were interested in. PSOF 3. But if they did not, it would not have prevented them from getting an interview. DSOF 68 (including response and reply). Dorsey specified interest in the Fire Marshal and Division Chief of Administration positions, as did Barbara Hack and Alan Stahl. DSOF 69; PSOF 91 (including reply). Bruce Andruss put in for the Division Chief of Training/EMS spot. PSOF 91 (including reply). And Jason Broadbent, Chuck Gatewood, and Paul Stafford put in for the Division Chief of Operations role. *Id.*

## 2. Interviews and Scoring

The interview panel for the Division Chief positions consisted of one internal representative (Standifer) and three external representatives: Dave Anderson, John Paul Jones, and Clint Patty. DSOF 73.[6] Anderson is the Deputy Fire Chief of the Olathe Fire Department and had only met Phillips once or twice. DSOF 75. Jones is a retired Fire Chief of the Kansas City, Kansas

---

[4]  The City states this fact is "controverted but immaterial to the analysis." Doc. 112 at 11. This does not satisfy the standard in D. Kan. Rule 56.1(c) for disputing facts.

[5]  Dorsey controverts this fact because "the process favored White male employees so all candidates were not on equal footing." Doc. 107 at 4. This does not controvert the fact. The testimony cited by Dorsey is from a former HR employee who observed in interviews that there was sometimes more banter and friendliness with some candidates over others, but that no one was scored differently or was treated unfriendly. *See id.* The other cited testimony is speculation that some candidates were assisted or excused from completing interview packets. *Id.* None of this evidence is about the 2022 Division Chief interviews, nor does it controvert the stated fact.

[6]  Dorsey contends that the panel was composed of "friends" of Phillips, which is largely based on the testimony of Chuck Gatewood that it "seemed" to him that the panel was composed of people who were all friends. PSOF 46.

Fire Department and had known Phillips professionally for 20 years, but he had not spent time with Phillips outside of work. DSOF 76; PSOF 48. Patty is the managing partner of Clayton Wealth Partners and served as the TFD's union attorney from 1998 through 2016. DSOF 74. Patty had worked with Phillips on union business, *id.*, and they were "very good friends," PSOF 53. Standifer participated because, as Deputy Chief, he was the only other person besides Phillips who would outrank the Division Chiefs. DSOF 81.[7] Although Standifer worked with Phillips in filling the Division Chief positions, Phillips would ultimately select the individuals for the positions. *See id.* (including response and reply);[8] *see also* DSOF 24, PSOF 1. Phillips did not attend the interviews. DSOF 79. All the panelists were White, except Standifer, who is White and Hispanic. PSOF 46 (including reply). A female Senior Assistant City Attorney was requested, but she was unable to participate. DSOF 77. A female HR representative also sat in, DSOF 78, but she did not participate, PSOF 56. Russell had no concerns with the interview panel. DSOF 86.

Jones and Anderson did not know any of the candidates, but Patty was familiar with two of them. DSOF 80. Patty was familiar with Stahl before the interview and got along with him. PSOF 54. Standifer had prior knowledge of each applicant and had worked with Dorsey at the same station prior to 2015. DSOF 83.

The panelists were not trained on what they could consider and were not advised on avoiding discrimination. PSOF 55. Interviews took place on April 7, 2022. DSOF 87. Eight people

---

[7]  Dorsey controverts that this was the reason and "why he sat in on the panel . . . was to alter the results," citing as support "all arguments and citations to the record that race factored into this decision making." Doc. 107 at 4. This does not controvert the fact and violates D. Kan. Rule 56.1(b), which requires reference "with particularity" to the part of the record on which the opposing party relies if a fact is controverted.

[8]  Dorsey disputes that Standifer was "not a decision maker" because he was responsible for filling the position with Phillips. Doc. 107 at 4. But in the testimony cited, Standifer says he worked with Phillips to fill the roles but "ultimately Chief Phillips would pick the individuals or select the individuals for these positions" and confirms that Phillips "had the ultimate say in who was hired for the position." Doc. 97-24 at 9 (transcript page 31:13-18) and 17 (64:11-14).

applied but only seven interviewed. DSOF 88. All those interviewed had at least twenty years of experience with the TFD. *Id.* The interview questions were pulled from prior interviews and were reviewed and approved in advance, and each applicant was asked the same questions. DSOF 90 (including response and reply). The use of standard questions increases the objectivity of the process. DSOF 91.[9] The applicants were scored on standard scoring sheets. DSOF 94. The scores for the applicants were as follows:

|  | Standifer | Patty | Anderson | Jones | Total |
|---|---|---|---|---|---|
| Stahl | 47 | 41 | 45 | 41 | 174 |
| Gatewood | 49 | 39 | 43 | 37 | 168 |
| Broadbent | 41 | 45 | 40 | 38 | 164 |
| Andruss | 45 | 41 | 41 | 34 | 161 |
| Stafford | 36 | 37 | 30 | 31 | 134 |
| Hack | 22 | 34 | 41 | 34 | 131 |
| Dorsey | 23 | 33 | 29 | 32 | 117 |

DSOF 95. The panelists provided notes on the scoring sheets. DSOF 96. The scoring was based on how the panelist believed the candidate answered the question and the information provided in response to the questions. DSOF 93. Standifer also considered his knowledge and experience in working with the candidates. *Id.* (including response).

Anderson testified he did not discuss the candidates with the other panelists. *See* DSOF 120. Anderson did cross out some scores for Plaintiff in favor of lower scores, and for another candidate, he wrote a "3" on top of a "2," which increased that candidate's score over Dorsey's. PSOF 89.[10] Standifer testified that after the interviews the panel discussed the candidates generally,

---

[9]    Dorsey agrees this is true unless "interview questions were leaked to certain White candidates." Doc. 107 at 5. The cited support is to testimony of some individuals who recall rumors or allegations about this happening "many years ago." *See id*. Dorsey does not suggest how or why this type of evidence would be admissible to prove that "certain White candidates" were given interview questions in advance in this case. There are no allegations or facts suggesting that any candidates were given the interview questions in advance of the Division Chief interviews in 2022.

[10]    That candidate was Stafford, who was ranked fifth out of seven, and who was not offered a position. *See* Doc. 97-20 at 9.

including whether Standifer knew them, but they did not discuss scoring. DSOF 120 (including response and reply); PSOF 88.

### 3.    Dorsey's Scores

Patty noted on his scoring sheet that Dorsey "struggled a bit with the answer" to the first question, struggled early with some answers, and was not as specific as other applicants. DSOF 97-98. But he also noted "good answer" to some questions. DSOF 97 (including response and reply).

Anderson noted that Dorsey gave a "very short answer – no context – bullet points" in response to one question and that he "didn't answer question" in response to another. DSOF 103. In an overall comment Anderson noted Dorsey "struggled to answer the questions fully," but still gave him a score of 4 or 5 on some answers (with 5 being the highest possible score). *Id.* (including response and reply). As noted, Anderson's score tally sheet for Dorsey reflects he crossed out three scores in favor of lower scores. PSOF 89.

Jones testified he scored based on Dorsey's responses. DSOF 104.[11]

Standifer noted Dorsey "stalled" on some answers. DSOF 100. He commented on the scoring sheet that Dorsey "had good presentation. Didn't speak at a Division Chief level of leadership." DSOF 102. Standifer testified he thought Dorsey's interview was dry and non-energetic, *id.*, and that he was among the "least energetic" of all the candidates and had too many pauses, PSOF 62, 66. Standifer rated Dorsey lower than the other panelists. PSOF 71. Standifer

---

[11]  Dorsey disputes this fact on grounds that Jones "had racial animus evidenced by findings against him in a KCKS lawsuit." Doc. 107 at 7. It's not entirely clear what "findings" Dorsey is referring to. The case in question was against the Unified Government of Wyandotte County, and at the time Jones was Fire Chief of the Kansas City, Kansas Fire Department. There were allegations of discrimination by Black firefighters, which included a statement by Jones that it was hard to hire Black firefighters because Jones believed Black people are afraid of fire. *See* Doc. 107-19 at 3; PSOF 50. Jones denied making that statement, Doc. 107-19 at 3, and continues to deny making that statement, Doc. 97-50 at 6 (transcript page 19:4 to 20:6). Jones later left the KCKFD, and it was ultimately determined he did not act properly. PSOF 52. Even construing these facts in Dorsey's favor, their materiality is lacking. The lawsuit did not involve the TFD or the Division Chief promotions.

testified another candidate's normal demeanor was quiet, but he still scored him higher than Dorsey. PSOF 65. Standifer gave Dorsey the lowest possible score for skills and experience and testified it was "probably because in part of the interviews and how he didn't do very well and the interviews, the long pauses, and not being energetic or seeming interested in the position during the interview." PSOF 68. But Standifer also rated him "fair" for overall interaction and level for enthusiasm, and "good" for how he presented himself. *Id.*; PSOF 69.

Standifer testified he couldn't explain the disparity in his scores for Dorsey versus the others, but perhaps it was his outside knowledge of Dorsey. PSOF 72. He did testify that he tried to be fair and objective toward Dorsey. PSOF 73. But he could not erase his past knowledge about the applicants. PSOF 75. He testified his prior knowledge of any particular candidate only factored in by ten percent. PSOF 76.

Standifer testified that Dorsey's status on light duty did not impact his scoring, nor did his race. DSOF 102. Dorsey testified he had told Standifer about his leukemia diagnosis at some point before the Division Chief interviews. *Id.* (including response).

Patty noted that Dorsey preferred the term "Black" instead of "African American." DSOF 99. Standifer also noted this but added, "what does that have anything to do with it." DSOF 101; *see also* PSOF 84-85.

### 4.    Decision

After the interviews, Phillips received a binder with the applications and interview scores. DSOF 121. The scores were a big part of the decision, but he also considered the candidates' experience, education, and overall skills. *Id.* After considering all the information about each

candidate, Phillips saw no reason to deviate from the top four scorers. *Id.*[12] Phillips tallied the scores with and without Standifer's scores and noted that the top four candidates did not change. DSOF 123. Phillips selected Andruss for the Training and EMS position, Broadbent for Operations, Gatewood for Administration, and Stahl for Fire Marshal. DSOF 126. Paul Stafford (White male), Barb Hack (White female), and Dorsey (Black male) were not promoted. DSOF 137.

Gatewood had applied for the Operations position, but Phillips offered him the Administration position because he believed Gatewood was better suited for it. DSOF 127. When Phillips offered Gatewood the Administration position, Gatewood said he did not apply for it and did not want it. PSOF 93. Phillips told him Operations had been offered to someone else and Phillips wanted Gatewood for Administration. *Id.* Gatewood later accepted that position. *Id.* Gatewood did not feel this process was fair, but he took the promotion because he was afraid he would not be promoted in the future. PSOF 94.

Phillips did not select Dorsey for a Division Chief position because he was not one of the top four applicants. DSOF 132.[13] After Phillips made his top choices, he and Standifer discussed which candidate would be best suited for each position. DSOF 122 (including response and reply). Philips considered the experience, strength, knowledge, and background of each of the top four to

---

[12] Dorsey attempts to controvert this fact by stating, "While Phillips stated these things, it is controverted this is true. Plaintiff incorporates by reference all his arguments and citations that race factored into this decision." Doc. 107 at 8. This fails to comply with D. Kan. Rule 56.1(b) and does not controvert the substance of DSOF 121.

[13] Dorsey controverts that "this was the reason," and "incorporates by reference all arguments and cites that race factored into this decision." Doc. 107 at 10. This fails to comply with D. Kan. Rule 56.1(b) and does not controvert the substance of DSOF 132. Dorsey also states that the "citation only states he was not top four." *Id.* But the citation includes the question, "How come you didn't hire Mr. Dorsey for any of these positions?" Doc. 97-9 at 17 (transcript page 63:14-20). Phillips responds, "I did not believe that Mr. Dorsey was one of the top four applications that I had to fill the four division chief positions that we had open." *Id.*

determine the best fit for each Division Chief position. DSOF 125.[14] Phillips testified he does not consider race in making decisions on promotions. DSOF 133 (including response and reply).

Russell testified that she could not recall an occasion where the highest scorer did not get the job, though this process of having one interview for four open positions was unusual. DSOF 136 (including response and reply). Russell did initially have concerns about the appearance of not hiring the only woman and the only minority who applied. PSOF 96. Phillips told her he selected the individuals he thought would perform best in the positions. *Id.* Phillips explanation satisfied Russell. DSOF 130. After reviewing the interview materials, Russell had no reason to conclude the selection process was not objective. *Id.*; DSOF 131; *see also* Doc. 97-26 at 59 (deposition page 234:4-8). Russell also testified that she would have raised concerns if the lowest scoring candidates were offered positions. DSOF 130 (including response and reply); *see also* DSOF 135 (including response and reply).

An HR representative sent Phillips an email on April 12, 2022 (after the interviews occurred), stating that Russell wanted him to provide the recommendations for the Division Chief positions before he made any offers. DSOF 128 (including response and reply). Typically, HR reviewed selections before offers were made. DSOF 129; PSOF 10; PSOF 97. This allowed HR to review the materials and raise any concerns and to ensure everything was equitable and fair. DSOF 129; PSOF 11. Hiring managers would also submit interview materials, scores, and notes for HR review. PSOF 10. HR would have concerns if a medical condition was listed in the interview notes and would verify this did not factor in the decision. PSOF 98. Likewise, references to race or anything of a protected nature would have been looked into. PSOF 100.

---

[14] Dorsey controverts that this was the basis for the decision, citing "all his arguments and citations that race factored into this decision making." Doc. 107 at 9. This fails to comply with D. Kan. Rule 56.1(b) and does not controvert the substance of DSOF 125.

But Phillips did not provide his recommendations before making the offers, DSOF 128, which was a first for Russell, PSOF 17. Phillips testified he was not aware he had to do that, DSOF 128 (including response and reply), though he was aware that HR was involved in things like approving job descriptions, postings, and observing in interviews, PSOF 15. In this case, the City Manager approved the process and promotions. PSOF 13 (including reply).

Phillips testified Dorsey never told him about his medical issues, though he may have known Dorsey was on FMLA leave at some point. *See* DSOF 134. Phillips was not aware that Dorsey applied for the Division Chief position because of his health issues, although some of the interview notes, which Phillips reviewed, noted that Dorsey had health issues and was thinking of retiring. DSOF 89 (including response and reply). The other panelists testified that it may have come up that Dorsey was on light duty but not that he had a disability, and that neither factor impacted their scoring, or they testified they didn't recall. *Id.* (reply citing deposition testimony). Dorsey testified that he said in the interview that he wanted the Division Chief position because of a medical issue. DSOF 105. Most of the panelists do not recall this being said, but they do not have many specific recollections of the interview overall. *Id.* (including response and reply). Dorsey also recalled that he told Phillips about his leukemia at some point while Phillips was Fire Chief. DSOF 134 (including response). He also recalled he told Standifer at some point but could not recall when. *Id.*; *see also* PSOF 145.

### 5. Stahl

Alan Stahl was ranked first by the interview panel. DSOF 106. Stahl had been with the TFD for 23 years, including 16 years on the specialty side. DSOF 107. He had also served 10 years in the Kansas National Guard, which included service in leadership positions. DSOF 108. He was also deployed multiple times. DSOF 109.

Stahl was the only applicant who had not held the Captain rank for two years and had no TFD management or supervisory experience. PSOF 24; PSOF 26. Stahl asked Standifer about the Captain requirement, and Standifer told him to apply if he was interested. PSOF 28. Another firefighter (a White male) asked Standifer if there was a Captain requirement, and Standifer repeated the requirement from the job posting. DSOF 28 (including reply). When Stahl applied, Phillips asked Russell whether Stahl met the Captain qualification. DSOF 111; PSOF 30. Russell advised Phillips that a Level III in a specialty position, which Stahl was, was the equivalent of a Captain rank, and he was eligible for a Division Chief position. DSOF 111.[15]

Gatewood did not feel it was fair for Stahl to be promoted because he had not been Captain for two years. PSOF 95. He was not aware of anyone else in a specialty position being allowed to apply for a Division Chief job and had never seen a specialty position count as Captain experience. *Id.*

Stahl received a verbal warning in 2016 for applying physical punishments to recruits, after which he threw a drink cup across the parking lot and sped out of the parking lot. PSOF 35. Phillips was union president at the time and would have been made aware of the discipline, though he could not recall Stahl's 2016 discipline. PSOF 36. In 2020, Stahl received a Documented Verbal Reprimand after an outburst after someone moved his vehicle. PSOF 37. This discipline was available for Phillips to review before offering Stahl the Fire Marshal position. PSOF 38. Standifer could not recall if he looked at the applicants' personnel files, and Standifer testified he and Phillips "dropped the ball" by failing to review the candidates' disciplinary history. PSOF 39-40. On

---

[15] Dorsey disputes that the union contract says the positions are equivalent. But he does not otherwise dispute that Phillips asked Russell and that Russell said Stahl's position was the equivalent of a Captain. Doc. 107 at 7. Dorsey also controverts another fact that Phillips deemed Stahl qualified based on Russell's advice, despite citations to deposition testimony to that effect, by "incorporat[ing] by reference all of his arguments and citations that race factored into this decision making." *Id.* This does not controvert the fact, nor does it comply with Dorsey's obligations under D. Kan. Rule 56.1(b).

April 15, 2022, Russell emailed Phillips about Stahl's discipline record because she thought it was not conduct that would normally be desired in a management position. PSOF 41-42. Russell would have brought this to Phillips' attention before offers were made had she been consulted. PSOF 43.

###     D.    Dorsey's Retirement

After Dorsey found out he did not get promoted on or around April 18 or 19, 2022, *see* Doc. 107-24, Dorsey texted a co-worker and friend and said, "I didn't deserve the job bro. That's the truth of the matter. . . . I've had a good experience so far concerning the way I've been treated down here but what would it be like when the honeymoon is over. Would it be a pleasant environment that I don't know but I have to move on with life." DSOF 138-139. He also reflected that "maybe I could have done more." PSOF 155. When he found out who received the promotions, he texted friends he thought it was unfair. PSOF 156.

On April 26, 2022, Dorsey gave notice of his intent to retire. DSOF 140. Standifer said, "I wish we would have known that you were leaving so we could have come out of our meeting to tell you goodbye!!!" Doc. 97-55. Phillips expressed his gratitude for Dorsey's service. *Id.* Phillips said he had "a few tokens of appreciation" that he wanted to give Dorsey and asked him to come back to get them. *Id.*; *see also* DSOF 141.

###     E.    Dorsey and Standifer

Dorsey had previously worked at the same fire station as Standifer. DSOF 32. Standifer testified that he recalled Dorsey was a "bare minimum" employee who just got by and did not volunteer for extra work. *Id.* Standifer did not recall any specifics as to why he felt that way. *Id.* (including response). Standifer also had limited interaction with Dorsey when they were both working in the administrative building. *Id.* Standifer also felt that Hack, the only woman applicant, did the bare minimum, that Stafford was unenergetic, and that Stahl had a temper. PSOF 59

(including reply); PSOF 61. But Standifer testified he wanted to give all the candidates a "clean slate" in the interviews. PSOF 61 (including reply).

At his deposition, Dorsey testified that he had concerns about Standifer being on the interview panel because Dorsey wasn't sure Standifer liked him based on a previous conflict when they were both working as Captains. DSOF 84. But he testified at his deposition that he had no reason to believe Standifer made judgments based on race and had no information that suggested Standifer is racist. *Id.* In response to the summary-judgment motion, however, Dorsey filed a declaration. Doc. 107-26. The declaration says that after Dorsey gave his deposition, he sat in on Standifer's deposition and heard Standifer discuss his decision-making process and "how he stereotyped Hack and I as 'lazy' and doing the 'bare minimum' as well as reducing my score for being 'low energy.'" *Id.* ¶ 5. This testimony and "other documents" Dorsey reviewed after his deposition "made it clear to [him] that Standifer and Phillips held racial bias against [him]" and factored this and his medical condition into the decision on the Division Chief promotion in 2022. *Id.*[16]

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that

---

[16] It's not clear what other documents Dorsey reviewed that led him to the conclusion that Phillips held racial bias against him, as the only specific evidence cited in Dorsey's declaration is Standifer's testimony. *See* 107-26 at ¶ 5. Dorsey's fact on this point also states only that he believes Standifer's scoring was based on race, without referencing Phillips. PSOF 157. The City argues Dorsey's declaration is a sham and should not be considered. Ultimately, however, this is not a material issue because a plaintiff's "mere conjecture" that an action was discriminatory is not sufficient to deny summary judgment. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1172 (10th Cir. 2007); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997) ("[S]ubjective belief of discrimination is not sufficient to preclude summary judgment.").

genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the nonmoving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.    ANALYSIS

The City moves for summary judgment on all claims. Dorsey pursues four claims in response to the motion: failure to promote based on race and disability, constructive discharge, and failure to accommodate. Dorsey's response does not address his retaliation claim or any claims based on FMLA leave. Those claims are therefore abandoned, and the City is entitled to summary judgment on them. *See Conroy v. Vilsack*, 707 F.3d 1163, 1170-71 (10th Cir. 2013) (holding claims not addressed are deemed abandoned). The Court addresses the remaining four claims in turn.

### A.    Failure to Promote – Race

Dorsey alleges race discrimination under Title VII based on him not being promoted to a Division Chief position. *See* Doc. 107 at 41. Title VII claims are generally evaluated under the familiar *McDonnell Douglas* burden-shifting framework.[17] *See Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). In the context of a failure-to-promote claim, the plaintiff must establish the following prima facie case: (1) he is a member of a protected class; (2) he applied for the position and was qualified; (3) he was rejected despite being qualified; and (4) after he was rejected, the position was filled. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir.

---

[17]  In the Pretrial Order, Dorsey argued he could show direct evidence of discrimination and would not need to rely on *McDonnell Douglas*. Doc. 94 at 11. Dorsey does not make that argument in response to the motion, however, and only relies on *McDonnell Douglas*. Doc. 107 at 41.

2003). If a plaintiff meets this initial burden, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its employment action." *Id.*

If the defendant meets that burden, the burden shifts back to the plaintiff to show that the stated explanation is a pretext for discrimination. *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1144 (D. Kan. 2011). At the pretext stage, the plaintiff must counter the stated legitimate reason with facts showing the decision was "pretextual or racially motivated." *Jones*, 349 F.3d at 1266. "A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer*, 493 F.3d at 1167 (internal quotation and citation omitted). A plaintiff can also show pretext by pointing to evidence that the defendant acted contrary to company policy. *Boese*, 814 F. Supp. 2d at 1144-45. A plaintiff does not need to present affirmative evidence of discrimination to survive summary judgment. *Swackhammer*, 493 F.3d at 1168. But evidence showing the falsity of an employer's proffered reason is only sufficient "if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate." *Id.* In considering whether the evidence of pretext gives rise to an inference of discrimination sufficient to survive summary judgment, courts consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . ." *Id.* at 1169.

The City does not dispute that Dorsey can make a prima facie case of race discrimination based on not being promoted. Doc. 97 at 33. The City also asserts that it had a legitimate,

nondiscriminatory reason for its action, namely that the top four scorers were promoted and Dorsey was not in the top four. *Id.* at 33-34. This satisfies the City's burden at this stage. *See Anderson v. Fort Hays State Univ.*, 2023 WL 2945859, at *3 (10th Cir. 2023) (finding a "legitimate, nondiscriminatory" reason where the plaintiff's scores were not among the top scores). The Court therefore turns to pretext.

The Court starts the pretext analysis by again noting the reason the City gave for not promoting Dorsey: he scored last out of all the applicants. He scored seventh out of seven and there were only four open Division Chief positions. The promotions went to the top four scorers. Evidence of pretext, therefore, should present a triable question as to whether that reason—that the promotions were decided based on scores—is unworthy of belief. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) ("He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."). For the most part, however, Dorsey does not dispute that he scored last. He does not dispute that the four applicants who were promoted received the four highest scores. He does not argue that the use of scores was an improper basis for the hiring decision. And, except for Standifer's scores, and perhaps some of Anderson's scores, he doesn't challenge how most of the scores were calculated.[18] There are no facts suggesting Dorsey's scores were actually higher and placed him in the top four. There's not even a cogent argument that his scores should have been higher. In sum, Dorsey points to almost nothing that would allow a factfinder to believe that the stated, non-discriminatory reason for the promotions was unworthy of belief.

---

[18]  As discussed further below, Phillips considered the scores both with and without Standifer's scores and the top four candidates did not change.

Nevertheless, the Court considers the arguments presented by Dorsey on the issue of pretext. Dorsey's pretext argument is wide-ranging and not particularly focused. In carefully reviewing the briefs, the Court believes Dorsey to be arguing pretext in the following ways: (1) the hiring process was a "sham" designed to only promote white candidates; (2) Phillips and Standifer relied on procedural irregularities to disadvantage Dorsey and the only female applicant, including allowing Stahl to participate, promoting Gatewood to a position he did not want, selecting the hiring panel, and circumventing HR; (3) Standifer manipulated the scores and acted as a cat's paw, and (4) Phillips and Standifer gave inconsistent testimony which calls their credibility into doubt.[19] Doc. 107 at 45-56. The Court considers each basis for pretext, while mindful of the totality of the circumstances.

### 1.    Sham Process Designed to Promote White Candidates

Dorsey alleges there is a history of race discrimination in the TFD, including overt racist hostility and discrimination in hiring practices. Importantly, Dorsey does not allege a disparate-impact claim or rely on statistics to make his case. *See, e.g.*, Doc. 107 at 55. Rather, he argues that historical instances of racism, which did not involve Phillips or Standifer, coupled with Phillips's and Standifer's long history with the TFD, would permit a factfinder to "infer they were chosen [for leadership positions in the TFD] to continue these long-standing policies." *Id.* at 46. But this is a leap too far. Inferences must be based on at least some fact. Here, all Dorsey points to is vague allegations of racism by unspecified individuals at unspecified points in history before surmising Phillips and Standifer must also share that animus and that they therefore somehow rigged the Division Chief promotion process to serve those ends. *See id.* at 45 ("There is evidence from which

---

[19]    Dorsey's brief addresses certain arguments by the City and clarifies that those are not things he is relying on to show pretext. *See* Doc. 107 at 53-55 (not relying on relative qualifications, seniority, or statistics).

a jury could infer that the entire hiring process was a sham meant to reach Phillips'[s] desired results."). But there is nothing in the record that Phillips or Standifer have any racial animus toward Dorsey or anyone else. Dorsey is not entitled to a trial for race discrimination simply because there have been historical issues or because other firefighters have brought claims of race discrimination unrelated to this case. Mere conjecture that race discrimination is afoot is not enough to defeat summary judgment. *See Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 658 (10th Cir. 2019).

### 2.    Procedural Irregularities Designed to Disadvantage Dorsey

Dorsey argues that procedural irregularities were used to disadvantage him in the Division Chief promotion process. Doc. 107 at 50-51. "[N]ot every failure to follow every directive in an employer's policy manual gives rise to an inference of pretext for invidious discrimination." *Johnson*, 594 F.3d at 1213. But "disturbing procedural irregularities" can be evidence of pretext. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003). A "procedural irregularity evinces pretext only if it directly and uniquely disadvantaged a minority employee." *Sasser*, 772 F. App'x at 672 (internal quotation and citation omitted).

Dorsey's argument about procedural irregularities focuses primarily on allowing Stahl to apply despite not having obtained the rank of Captain and ignoring his disciplinary record, promoting Gatewood to a position he did not want, Phillips's selection of the panel, and circumventing HR. The Court considers each of these allegations with an eye to whether these alleged irregularities unfairly impacted Dorsey.

### a.    Stahl

Dorsey focuses heavily on the fact that the Division Chief job posting required two years of Captain experience, but Stahl was allowed to apply despite never having been a Captain. Dorsey

argues that "[o]ne could reasonably infer" that Stahl was allowed to apply "to provide another candidate to hire instead of Plaintiff." Doc. 107 at 47.

As an initial matter, it is undisputed that, when Stahl inquired, Phillips checked with HR on whether Stahl had equivalent experience to being a Captain, and HR told Phillips that Stahl's experience was equivalent. The Court must consider the facts as they appeared to the decisionmaker. *Sasser*, 772 F. App'x at 658. "The evidence must create a factual issue that the employer didn't really believe its proffered reasons for the action and thus may have been pursuing a hidden discriminatory agenda." *Id.* (cleaned up). When considering the facts as they appeared to Phillips, the Court cannot ascribe a pretextual motive to Phillips allowing Stahl to apply where it is undisputed that HR told him it was allowed. Dorsey's theory that Phillips somehow machinated Stahl's involvement as a pretext to disadvantage Dorsey cannot stand up in light of this undisputed evidence.

Additionally, Stahl's participation in the promotion process did not uniquely disadvantage Dorsey. It impacted all candidates. Stahl was allowed to apply before the interviews occurred, before the scores were assessed, and before any offers were made. All the candidates had to compete against Stahl. Stahl outscored them all. Dorsey suggests Stahl being allowed to apply uniquely targeted him because it created an additional competitor in the positions for which he was applying (Fire Marshal and Division Chief of Administration). But it is undisputed that there was just one interview process for all open positions and that all candidates were being considered for all positions. DSOF 60. Although the applicants stated what roles they were interested in, there are no facts suggesting that Phillips knew Stahl was interested in the same positions as Dorsey, let alone that he encouraged him to apply as a means of freezing Dorsey out of a promotion. Additionally, the decision to let Stahl apply came before the interviews. Stahl scored highest and

Dorsey scored lowest, and promotions were offered based on the scores. Dorsey offers no explanation as to how Phillips knew Stahl would score ahead of Dorsey, let alone highest of all the candidates, and thus would be able to promote him over Dorsey on that basis. *See Conroy*, 707 F.3d at 1180 (rejecting argument that "changing a job description to attract more or different candidates, when perfectly qualified candidates have already applied for the position, is illegitimate per se under Title VII").[20]

Finally, Dorsey suggests manipulation of the process because Stahl was promoted despite having a disciplinary record. There are no facts suggesting that this disqualified Stahl from the promotion. Even to the extent Phillips "dropped the ball" in not considering Stahl's disciplinary record, there is no evidence that it was intentionally overlooked to somehow disadvantage Dorsey specifically. All candidates were equally impacted. Moreover, even if Phillips made an imprudent decision in promoting Stahl or anyone else, this is not sufficient to show pretext. *See Swackhammer*, 493 F.3d at 1169-70 ("Evidence that the employer should not have made the [employment] decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility."); *Conroy*, 707 F.3d at 1177 (cautioning courts to not act as "super personnel department that second guesses employers' business judgments").

### b.    Gatewood

Dorsey argues that Phillips promoted Gatewood to the Division Chief of Administration position, which Gatewood did not want, to avoid promoting either Dorsey or Hack (the only woman applicant). Again, there is no evidence to support this theory beyond Dorsey's speculation.

---

[20] *Conroy* noted that a plaintiff may attempt to show that the <u>reasons</u> for relisting a position were discriminatory. 707 F.3d at 1180. But Dorsey has no evidence beyond speculation that Phillips's decision, and by extension Russell's decision, to allow Stahl to apply was to achieve a discriminatory purpose.

It is undisputed that there was just one interview process for all open positions and that all candidates were being considered for all positions, even though they were asked which positions they preferred. Even if the Court accepts Dorsey's premise that both Phillips and the candidates were originally treating them as separate applications for separate positions because they were asked to specify preferences, Gatewood receiving the Administration position does not support an inference that Dorsey was denied the position because of discrimination. The promotions were given to the highest scorers. Gatewood scored the second highest of all the candidates. Dorsey scored the lowest.[21] The fact that Gatewood was not originally interested in the Administration position but was offered it anyway does not call into question the stated reason for who was promoted. It actually underscores it because the candidates with the highest scores were promoted regardless of what spots they wanted.

### c.    Selection of Hiring Panel

Dorsey also argues that Phillips manipulated the hiring process to disadvantage Dorsey by selecting the interview panel. Doc. 107 at 48. Dorsey argues a factfinder "could reasonably infer that Standifer was there to serve as Phillips'[s] eyes and ears, to ask questions, give scores, and otherwise influence the process to effectuate Phillips'[s] desired outcome" and also notes that other panel members were friendly with Phillips and one had been accused of racism in a prior case. *Id.* But this does not support an inference of discrimination. Dorsey has not pointed to any evidence in the record that Phillips harbored a racial animus or had any "desired outcome" beyond filling the open Division Chief positions. The fact that <u>the Fire Chief</u> led the hiring process is not nefarious, nor does it give rise to an inference of discrimination. Nor is it problematic that he

---

[21]    Dorsey argues that Hack (the only woman candidate) also sought the Administration position. Hack scored higher than Dorsey. If Gatewood should not have been considered, the job likely would have gone to Hack, not Dorsey.

selected for the panel the only other internal TFD person who would rank ahead of the Division

Chiefs (Standifer, the Deputy Fire Chief), or that he knew the other panel members. Moreover, the

panel interviewed all the candidates, so all the candidates were equally impacted by the makeup

of the panel. *See Johnson*, 594 F.3d at 1213 ("In the case before us, it is undisputed that every

candidate, not just Ms. Johnson and not just the female applicants, was interviewed by the seven-

member committee.").

The fact that one panel member had previously been involved in a discrimination suit

(Jones) does not support an inference that discrimination was at work here. *Sasser*, 772 F. App'x

at 662 (rejecting as speculative an "attempt to extrapolate from evidence of general bias to specific

discrimination"). Notably, Dorsey does not make any allegations against Jones in this case other

than that he was previously part of a discrimination case. He does not even challenge Jones's

scores for him. Jones's scores for Dorsey were in fact the second highest of the four panelists.

In sum, Phillips's selection of the panel does not give rise to an inference of discrimination.

### d.    Circumventing HR

Finally, Dorsey makes some allegations that Phillips circumvented HR in the promotion

process. There are several facts relating to this issue stated in the fact section, but Dorsey does not

make a defined argument about it or explain how this demonstrates pretext. The Court nevertheless

addresses HR's role in the Division Chief promotion process for the sake of completeness and

finds it does not call into question the stated reason for Dorsey not being promoted.

It is undisputed that Phillips made offers before HR had a chance to review them. HR

review was typically done before offers were made to raise any concerns. Russell testified that she

did initially have concerns about the optics of not offering promotions to the only woman and

minority who applied. But Phillips explained his reasoning, and Russell was satisfied. After she

reviewed the interview materials, Russell had no reason to conclude the selection process was not objective. She also testified she could not recall a situation where the highest scorer did not get the job, and she would have raised concerns if the lowest scorers had been offered promotions.

Thus, to the extent Phillips circumvented HR in making the promotions, Dorsey has not shown how this shows pretext.

### 3. Standifer's Scoring and Role as the Cat's Paw

Dorsey next argues that Standifer's bias tainted the results against him. Doc. 107 at 51-52. This invokes the cat's paw theory of liability, which refers to situations where a biased subordinate who does not have the power to make an employment decision uses the actual decisionmaker "as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006). This "allows a plaintiff to establish pretext even without evidence that the 'actual decisionmaker' possessed an unlawful motive." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). To survive summary judgment on this theory, a plaintiff must present a genuine issue of fact that "(1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Id.* at 1038; *see also BCI Coca-Cola Bottling Co.*, 450 F.3d at 487 (noting that the issue turns on "whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action"). The Court finds Dorsey fails to point to any facts from which a reasonable factfinder could find that Standifer was racially biased or that he caused Phillips to deny Dorsey a promotion.

On the issue of whether Standifer was motivated by a discriminatory animus, the only fact Dorsey points to is that Standifer wrote in his interview notes that Dorsey prefers to be called

Black and also noted, "what does that have anything to do with it." Doc. 107 at 51.[22] This does not

suggest Standifer was racially biased against Dorsey. There's no dispute that Dorsey said in his

interview he preferred to be called Black. Another panelist noted it as well. Standifer's added note

questioning why it mattered does not show he was motivated by racial animus.

Even if the Court construed the comment as evidence of racial animus, there is no genuine

issue of fact that Standifer's scores were manipulated to discriminate against Dorsey, as he argues.

*See* Doc. 107 at 48-49. It is undisputed that Standifer's scores for Dorsey were lower than those

he gave to the other candidates (save for perhaps Hack). Dorsey relies on Standifer's testimony to

argue that Standifer cannot plausibly explain the lower scores he gave Dorsey. But the undersigned

is not convinced that the scoring outliers or Standifer's inability to explain his scoring years later

in a deposition is enough, <u>standing alone</u>, for a reasonable factfinder to conclude that he was

motivated by discrimination in his scoring of Dorsey. *See Conroy*, 707 F.3d at 1175 (holding that

discrepancies in the panel members' evaluation criteria were "minor" and "insufficient to

demonstrate pretext" especially where panel members were not final decisionmakers). The focus

of a discrimination claim is not whether an employer made a good decision, or wise decision, or

even a rational one. *See Swackhammer*, 493 F.3d at 1169-70 ("Evidence that the employer should

not have made the termination decision—for example, that the employer was mistaken or used

poor business judgment—is not sufficient to show that the employer's explanation is unworthy of

credibility."). Rather, there must be something that gives rise to an inference of discrimination—

that discrimination, rather than bad judgment or bad memory can explain the low scores. *See id.*

---

[22] Dorsey attempts to couple this with "other instances" involving Standifer. Doc. 107 at 52. Those "other instances" cited involve an alleged statement by Standifer about women, PSOF 57, and a response to a deposition question about a Black firefighter where Standifer questioned if he was doing his job, PSOF 58. These "other instances," even when combined with the "what does that have anything to do with it" remark are not evidence from which a reasonable jury could find any racial bias by Standifer, let alone the "clear bias" Dorsey argues for. Doc. 107 at 52.

at 1168 (noting that a weak issue of fact may not give rise to an inference of discrimination). As explained above, Dorsey has no evidence that Standifer was motivated by racial discrimination. On this record, there is nothing on which a factfinder could find that Standifer's scores were discriminatory or manipulated to dictate an outcome.

Moreover, it is undisputed that Phillips considered the candidates' overall scores both <u>with and without</u> Standifer's scores. The top four did not change. Removing Standifer's scores for Dorsey did not move him into the top four; it did not even move Dorsey out of last place. *See Sasser*, 772 F. App'x at 660 ("[E]vidence of a single panelist's impropriety has limited relevance where the panelist's decision didn't determine the adverse employment action."); *cf. Singh*, 936 F.3d at 1038 (stating that a biased subordinate is the proximate cause of the action if a final decisionmaker takes the action based on "uncritical reliance" on facts provided by the subordinate).[23] Thus, even accepting that Standifer's scores were suspect, and that they were suspect for a discriminatory reason, they did not cause Phillips to not promote Dorsey.

Dorsey argues there is also "reason to believe Standifer worked to lower the scores of his fellow panelist." Doc. 107 at 52. But the undisputed facts show that while the panelists discussed the candidates generally after the interviews, they did not discuss scoring. Anderson's score sheet did reflect that he at some point changed some scores in Stafford's favor and against Dorsey. But it is not true, as Dorsey claims, that "[t]his could have combined to lower [Dorsey's] score enough to cost him his promotion." *Id.* If you give Dorsey the extra points and take them away from Stafford, Dorsey's overall score is still the lowest. Even if you also remove Standifer's scores

---

[23] Dorsey presents facts that Standifer and Philips discussed who to hire. But the undisputed facts only show that they discussed where to place the candidates after Phillips made his top four choices. Furthermore, simply discussing the candidates would not demonstrate that Standifer was the proximate cause of the selections ultimately made by Phillips, especially given Phillips's undisputed reliance on the scores. *Singh*, 936 F.3d at 1039 ("But showing that Cordle took Alexander's recommendation into account does not necessarily mean that Alexander was a <u>proximate cause</u> of the adverse action.").

while making these adjustments, Dorsey still only places sixth out of seven. It is undisputed that Phillips gave the promotion to the top four scorers. *See Johnson*, 594 F.3d at 1214 ("Perhaps even more pointedly still, as a practical matter Ms. Connolly's vote made no difference: even without Ms. Connolly's 'not recommended' vote—indeed, even disregarding Ms. Connolly's scoring of candidates altogether—Ms. Johnson still ranked fourth out of the five candidates, not in the top two destined to advance for final consideration.").

In sum, Dorsey's arguments about Standifer's scoring or his cat's-paw theory fails because there is no evidence that Standifer harbored racial bias or that he impacted Phillips's decision.

### 4.    Inconsistent Testimony

Finally, Dorsey argues that Phillips and Standifer gave inconsistent and potentially dishonest deposition testimony, from which a factfinder could infer "an attempt to cover up a discriminatory motive." Doc. 107 at 52. But the allegedly inconsistent or dishonest testimony just reflects an inability to recall dated events or is about minor issues like who wrote the job description. None of the statements call into question the stated reason Dorsey wasn't promoted, namely that he scored the lowest in the interview. A "weak issue of fact as to whether the employer's reason was untrue" cannot raise an inference of discrimination. *Swackhammer*, 493 F.3d at 1168.

In sum, none of the evidence Dorsey points to as evidence of pretext could "reasonably lead the trier of fact to infer a discriminatory motive." *Id*. Dorsey has no evidence that the decisionmaker—Phillips—harbored any racial animus. Nor has he pointed to evidence from which a reasonable factfinder could conclude that the racial animus of anyone involved—to the extent there is admissible evidence to suggest anyone had such animus—caused Phillips to make a discriminatory decision. Any procedural differences in the process impacted all candidates. Dorsey

was not promoted because he scored the lowest. None of Dorsey's arguments suggest this reason is unworthy of belief. The City is entitled to summary judgment on his race-discrimination claim.[24]

### B.    Disability Discrimination

The Court next considers Dorsey's claim that he was not promoted because of his disability. A claim for disparate treatment based on disability is analyzed under the *McDonnell Douglas* burden-shifting test. *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 989 (10th Cir. 2021). The plaintiff must first establish a prima facie case: (1) he is disabled, (2) he was qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of the disability. *See id.* at 989-90. The burden then shifts to the defendant to articulate nondiscriminatory reasons for its actions. *See id.* at 990. The plaintiff then bears the burden of showing the proffered reason was pretext for discrimination. *See id.* A plaintiff may demonstrate pretext by pointing to facts that a factfinder could rely on to conclude that the stated reason for the employment action is unworthy of belief. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). This can be done by pointing to evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the stated reason. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007).

The City does not challenge Dorsey's ability to meet the first two elements of a prima facie case of disability discrimination. But, on the third element, the City argues there is no evidence to infer Phillips's decision not to promote Dorsey was based on Dorsey's disability. In response, Dorsey points to Standifer's statement that he scored Dorsey low because he was not "energetic," and that his disability causes, among other issues, fatigue. Dorsey argues that "[w]hile not

---

[24] The Court is aware that summary judgment was denied in the sex-discrimination case Hack brought against the City based on her not being promoted to Division Chief. *See Hack v. City of Topeka, Kan.*, 2025 WL 1548177 (D. Kan. 2025). But some of the facts and arguments presented in that case are different from those presented here. The Court has focused its analysis on the facts and arguments as they were presented in this case.

conclusive, this could refer to Plaintiff's condition and meet his non-onerous burden, showing a prima facie case."[25] Doc. 107 at 57.

This fails to meet the prima facie element that Dorsey was not promoted because of his disability. Dorsey points to no facts that demonstrate that Standifer's "energetic" remark was tied to any medical condition. Even to the extent such an inference could be made, it is undisputed that Standifer found both Dorsey <u>and</u> Hack to be less "energetic" than the other candidates. He also described another candidate that way. There are no facts suggesting that Standifer linked this to a medical condition at all, let alone as to Dorsey only. Dorsey's argument based on Standifer's comment also ignores that it was Phillips who made the decision about who to promote, not Standifer.[26] Dorsey's disability-discrimination claim based on a failure to promote therefore fails because Dorsey has not come forward with any evidence showing a prima facie case of disability discrimination.

Even if Dorsey could establish a prima facie case of disability discrimination, this claim would still fail. The City has come forward with a legitimate, nondiscriminatory reason why Dorsey wasn't promoted, specifically his low score in the interview. Dorsey has not put forth any evidence that this reasoning was a pretext for <u>disability</u> discrimination. Dorsey's response only incorporates by reference his pretext arguments for <u>race</u> discrimination. *Id.* None of those arguments suggest that the real reason Phillips didn't promote Dorsey was because of his disability. The Court understands the City also incorporated its pretext argument, *see* Doc. 97 at 51, and

---

[25] For purposes of summary judgment, the Court accepts Dorsey's testimony that he told Phillips and Standifer about his leukemia.

[26] Dorsey does not make a cat's paw argument regarding disability discrimination. There are no facts or argument that Standifer harbored a disability bias and scored Dorsey accordingly to manipulate Phillips into a decision based on Dorsey's disability. It is also undisputed that Dorsey's scores were lowest even discounting Standifer's scores. So even if the Court were to presume Standifer's "energetic" remark was linked to Dorsey's disability, it did not impact the ultimate decision made by Phillips.

Dorsey opted to do likewise. Dorsey did so at his own risk, however. The burden of establishing a factual basis for pretext falls on the plaintiff, not the defendant. Even if Dorsey's pretext arguments for race discrimination applied to the disability-discrimination claim, the Court has found that none of the arguments call into question the stated reason Dorsey was not promoted, namely his low interview scores.

The City is entitled to summary judgment on Dorsey's disability-discrimination claim.

### C.    Constructive Discharge[27]

Dorsey alleges he was constructively discharged. "A constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Tran v. Trs. of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th Cir. 2004). The test is objective. *Id.* The subjective views of the employee and employer are not considered. *Id.* "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.* This is a substantial burden for a plaintiff. *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010).

Dorsey has not come forward with sufficient facts on which a jury could find he was constructively discharged. Dorsey does not point to any facts suggesting he was being harassed or was the target of any discriminatory conduct. He points to nothing that anyone at the TFD did that made his working condition intolerable. *See PVNF, L.L.C.*, 487 F.3d at 805 (explaining that constructive discharge occurs when an employer's "illegal discriminatory acts" make working

---

[27] Dorsey initially argues he was constructively discharged because of his race. Doc. 107 at 41. But the only reason Dorsey asserts for his constructive discharge is his disability. *Id.* at 42-43. Dorsey does not argue that his working conditions were intolerable for reasons related to his race. Therefore, the Court does not analyze a race-based constructive-discharge claim. To the extent Dorsey was asserting such a claim, it would fail for the same reasons as his disability-based constructive-discharge claim.

conditions intolerable). Dorsey just not being promoted to Division Chief is not sufficient. *Waggoner v. Frito-Lay, Inc.*, 2023 WL 2967693, at *7 (10th Cir. 2023) ("[D]enial of promotion, even if discriminatory, does not necessarily establish a reasonable person would have felt compelled to resign.").

Rather, Dorsey argues only that he retired because he believed his light duty would "soon expire," and he would be forced to return to his normal firefighting work, which would have been dangerous for him. Doc. 107 at 43. Even assuming this is a proper fit for a constructive-discharge claim, *see Fryer v. Coil Tubing Servs., LLC*, 415 F. App'x 37, 47 (10th Cir. 2011) (stating that "a plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged" (internal quotation and citation omitted)), Dorsey's claim fails because it is based only on his subjective belief that retirement was his only option.

There are no facts suggesting that Dorsey's light-duty status was being revoked, that it was ending, or that he could not seek additional time on light duty or another accommodation. There are no facts suggesting the TFD planned to immediately force him back into firefighting when his current term of light duty expired. Sick leave and FMLA were also available. Dorsey nevertheless apparently assumed his light duty would expire on June 4, 2022. But no one at the City told him that. Given that Dorsey went on light duty in October 2021, it's not clear why Dorsey assumed it would end June 4, 2022, where the union contract provided for light duty of up to 18 months. Even under that contract, light duty could be extended beyond 18 months. But there are no facts that Dorsey ever requested an extension.

There are no facts in the record that Dorsey's decision to retire was anything but his own unilateral decision based on his apparent assumption that his light duty might end at some point. This is not sufficient to state a claim for constructive discharge. *See Waggoner*, 2023 WL 2967693,

at *7 ("Mr. Waggoner's second reason also is based on his own speculation. And even if he believed his job was in jeopardy, it would not mean that he had no other choice but to quit."); *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1222 (10th Cir. 2002) (finding no constructive discharge where a plaintiff resigned before he had the "complete details" of the position he was being transferred to). The facts in the record do not suggest that Dorsey lacked the "opportunity to make a free choice." *Narotzky*, 610 F.3d at 566. Nor do they suggest a reasonable person in his circumstance would find retirement the only option. *See, e.g., Molina v. Equistar Chemicals, L.P.*, 2006 WL 1851834, at *7 (S.D. Tex. 2006) ("Here, Plaintiff's complaints of being asked to perform duties that fall within his job description, not being promoted when he was not expecting to be, voluntarily selecting to sit where he desires at lunch-box meetings, and not being offered light duty work, do not begin to amount to a hostile work place, and as such, do not amount to constructive discharge.").

The City is entitled to summary judgment on Dorsey's constructive discharge claim.[28]

### D.    Failure to Accommodate

Dorsey claims the City failed to accommodate his disability when it did not promote him to Division Chief. The ADA[29] prohibits discrimination based on disability. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1047-48 (10th Cir. 2017). One way an employer can discriminate under the ADA is by failing to accommodate an employee's disability under certain circumstances. *See id.* at 1048. A plaintiff establishes a prima facie claim of failure to accommodate by showing that (1) he was disabled; (2) he was qualified for the job; (3) he requested a plausibly reasonable accommodation;

---

[28]    Dorsey alternatively argues that his "loss" of employment should be considered for purposes of damages on his failure-to-promote claim. By this order, the Court has dismissed all Dorsey's claims and damages are not at issue.

[29]    The governing law is now the ADA Amendments Act of 2008 ("ADAAA"). The Court applies the amended law and regulations. But the Court continues to use the term "ADA" for ease of reference.

and (4) the employer refused to accommodate the disability. *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020).

"[B]efore an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). No "magic words" are required as long as the employee makes clear he needs assistance for his disability. *Id.* The ADA does not "require clairvoyance," however. *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810 (10th Cir. 2016). Rather, an employer must know both that an employee has a disability and that an accommodation is needed. *Id.* at 814. Only then is an employer obligated to engage in the interactive process. *See Edmonds-Radford*, 17 F.4th at 993 n.11.

The City argues Dorsey did not request an accommodation when he applied to be Division Chief. Doc. 97 at 52. And even to the extent he did, promotion to Division Chief is not a reasonable accommodation. *Id.* at 52-53. Dorsey's only other accommodation requests for FMLA and light duty were granted. *Id.* at 53.

Dorsey testified that he said in his interview he wanted the Division Chief position because of his disability. Assuming that this sufficiently notified the City that Dorsey was seeking an accommodation for a disability,[30] an employer is not required to accommodate a disability by giving an employee a promotion. "*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("To the extent that any such transfer would be a promotion, the ADA does not require this accommodation from defendant."); *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 996 (7th Cir.

---

[30] The Court is somewhat dubious that a statement in an interview about why Dorsey was seeking a promotion is a sufficient request for an accommodation, especially considering that the panel was primarily made of individuals who did not even work for the City.

2024) ("[A] promotion is not a reasonable accommodation."). This is because the ADA "is not a statute giving rise to a right to advancement." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1176 (10th Cir. 1999). "[T]he only positions that need to be considered for a reassignment are those that are not promotions." *Id.* Thus, to the extent Dorsey argues the City failed to accommodate him by not making him a Division Chief, the City was not required to do so to comply with the ADA. *See id.* at 1180 ("For example, an employer might be entitled to summary judgment if the record established that reassignment . . . would constitute a promotion . . . .").

Dorsey seems to acknowledge this and argues that even if a promotion cannot be an accommodation as a matter of law, the City still failed to engage in the interactive process. Doc. 107 at 58. But the undisputed facts suggest otherwise. Dorsey was placed on light duty due to his health in October 2021, and light duty would've continued until at least June 2022. There are no facts suggesting that light duty was not accommodating his health needs or that Dorsey requested but was denied any other accommodation besides the promotion to Division Chief. Although Dorsey presumed his light duty might end, the City never told him it would be ending. After Dorsey did not get hired as a Division Chief, he retired almost immediately, even before he believed his light duty would expire. Other than the promotion, which the City was not required to give Dorsey as an accommodation, and the light duty, which Dorsey had, it is unclear what additional accommodation he needed, sought, but was not given, nor is it clear what interactive process would've been needed at that point. Dorsey retired almost immediately after not being promoted to Division Chief.[31] Thus, even if there was more process or accommodation the City could have offered, Dorsey's retirement precluded it. *Jackson v. Blue Mountain Prod. Co.*, 761 F.

---

[31] Dorsey gave his notice on April 26, just a few days after he was notified he was not promoted. In some of the texts to his friends stating that he didn't get the promotion, Dorsey indicates he had already taken affirmative steps to retire when he found out he was not selected. *See* Doc. 97-54.

App'x 356, 361 (5th Cir. 2019) ("When an employee voluntarily retires, he terminates the interactive process, making summary judgment appropriate because it becomes difficult to discern what measures may have been taken had accommodation discussions continued."); *McDonald v. UAW-GM Ctr. for Hum. Res.*, 738 F. App'x 848, 855 (6th Cir. 2018) ("We also have previously noted that an employee who quits before the accommodation request's resolution is at fault for any breakdown in the interactive process, not the employer.").

The City is entitled to summary judgment on Dorsey's failure-to-accommodate claim.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion for Summary Judgment (Doc. 97) is GRANTED. The Clerk shall enter judgment in favor of Defendants.

IT IS SO ORDERED.

Dated: September 3, 2025                     /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE